Filed 1/25/23  Jacobs v. Sharp Healthcare CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| VALORI JACOBS, | D079404 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2019-00070139-CU-MM-CTL) |
| SHARP HEALTHCARE et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Richard S. Whitney, Judge.  Reversed and remanded with directions.

The Law Office of Herb Fox and Herb Fox for Plaintiff and Appellant.

Dummit, Buchholz & Trapp, Scott D. Buchholz, William R. Moore and Amanda K. Crawley for Defendants and Respondents.

INTRODUCTION

Valori Jacobs sued her treating physician for medical malpractice, alleging he was negligent in performing her sinus surgery and failed to obtain her informed consent before performing additional procedures during surgery.  Jacobs also sued Sharp Healthcare and Sharp-Rees Stealy Medical

Group, Inc. (collectively, Sharp), which operated the hospital facility where she was treated and had the surgery, alleging the surgeon was an "employee and/or contracted agent" of Sharp's.

Sharp demurred to Jacobs's operative complaint on the grounds the statute of limitations had run on the first cause of action for professional negligence, under Code of Civil Procedure section 340.5,[1] and that claim and the second cause of action for lack of consent failed for "uncertainty" because there were no allegations establishing how Sharp was liable for the physician's actions. The trial court agreed and sustained Sharp's demurrer without leave to amend.[2]

We reverse as to the first and second causes of action. On our de novo review, we conclude the operative complaint does not clearly and affirmatively establish, as a matter of law, that Jacobs's professional negligence claim is time-barred, and that it sufficiently alleged Sharp's liability for the physician's actions on the basis of ostensible agency.

---

[1]    All further unspecified statutory references are to the Code of Civil Procedure.

[2]    On appeal, Jacobs does not challenge the trial court's ruling sustaining the demurrer as to the third cause of action for fraud for uncertainty and the fourth cause of action for " 'medical incompetence for procedures performed' " as duplicative of the professional negligence claim.

2

## FACTUAL AND PROCEDURAL BACKGROUND

## I.

### *Factual Allegations*[3]

Jacobs was treated by Dr. James Amsberry—an ear, nose, and throat (ENT) specialist who practiced out of the Sharp facility in San Diego—for sinus nasal congestion and allergic rhinitis from 2017 to 2019. She was first seen by Dr. Amsberry on January 6, 2017. Dr. Amsberry diagnosed Jacobs with nasal polyps and a right-sided deviated septum and recommended turbinate reduction to open the nasal passages, septoplasty to correct the deviated septum, and sinus surgery to remove the polyps. Dr. Amsberry told Jacobs the risks associated with anesthesia and that surgery might not lead to any improvement, but he did not inform her of the "[s]pecific risks" of surgery. Jacobs trusted Dr. Amsberry's opinion and agreed to the surgery.

On February 28, 2017, Jacobs had the surgery with Dr. Amsberry at the Sharp facility in San Diego. After the surgery, Jacobs was in "excruciating pain." She had difficulty breathing and felt "overall distress." Dr. Amsberry agreed to an overnight hospital stay for monitoring, but told her "there were no complications" from the surgery.

On March 1, 2017, Jacobs felt "palpitations, rapid heartbeats, and pressure in her chest along with pain that pulsated down her left arm and

---

[3]     We derive the relevant facts from the operative second amended complaint (SAC). And because this is an appeal from a judgment entered after a demurrer was sustained, we accept as true and liberally construe the facts alleged in the SAC. (*Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217, 225; *Perez v. Golden Empire Transit Dist.* (2012) 209 Cal.App.4th 1228, 1238.) We also note Jacobs was a self-represented litigant during the pleading stage, and her counsel on appeal acknowledges her pleadings were not a " 'model of clarity, conciseness or consistency.' "

into [the] chest area." She was told by someone in Dr. Amsberry's office to go to the emergency room, which she did by ambulance. The "ER physician" told her that sometimes patients who have undergone sinus surgery can experience nerve pains. Jacobs was monitored and sent home the same day.

On March 8, 2017, Jacobs saw Dr. Amsberry in her first post-surgery visit. She complained of nasal dryness, pain or pressure on the inside of her head, an "empty hollow feeling inside her nose," the feeling her lungs were not getting enough oxygen, and burning in her eyes. Dr. Amsberry told her everything was "normal" except "no one had ever complained of the eye burning before." He told Jacobs "everything was looking good" and "mentioned that the stents would be removed" from her nasal cavity at the next visit.

But at the next visit, on March 22, 2017, Dr. Amsberry explained he had instead used "dissolvable packing" for the nasal stents. Jacobs continued to complain of pain and pressure, nasal dryness "along with thick yellow mucus production" in her nasal passages, and "liquid coming from the nose." Dr. Amsberry "convinced her" the liquid was saline rinse. He prescribed her antibiotics and medically cleared her to return to work the next day.

Jacobs had four more post-surgery visits with Dr. Amsberry. He told Jacobs it would take at least one year to heal completely from the surgery. On March 29, 2017, she continued to complain of pain in her sinuses, pressure in the head, abnormal breathing, and now there was "the sound of a soda can popping inside her head." Dr. Amsberry performed an endoscopic examination and, again, assured her "everything was looking good."

On April 26, 2017, Jacobs asked Dr. Amsberry if the symptoms she was experiencing, including sinus infections, "could be" the result of the surgery. She told him she felt some relief while on antibiotics, but the symptoms

4

returned with "worsening pain . . . deep inside her head" when she finished the prescribed dosage. Dr. Amsberry suggested "a revision surgery may be needed to address some clean up on the right frontal sinuses."

On June 7, 2017, Jacobs told Dr. Amsberry "[s]he was concerned that the antibiotics were not clearing the infection, the antibiotics may not have been properly prescribed, or perhaps some other pathology was responsible for the continuous infections." She had on several occasions asked about tests that could be performed to determine the type of infection, or whether it could be a "CSF leak" (cerebrospinal fluid leak) or "Empty Nose Syndrome" or "any other complications from surgery." Dr. Amsberry told her there were no signs of a CSF leak and he did not think she had empty nose syndrome.

Jacobs continued to see Dr. Amsberry for treatment through March 2018 "in hopes of getting relief." But her symptoms persisted and worsened. When she told Dr. Amsberry she felt increasing pain at the base of her skull, he told her "the pain was not related to her sinuses, because 'your sinuses are not in the back of your head.'" Dr. Amsberry again suggested a revision surgery but Jacobs was "apprehensive" about having another surgery because of her experience with the first one. She wanted to explore options other than surgery. Dr. Amsberry told Jacobs to follow up with her primary doctor, Dr. Tom-Oliver Klein,[4] who also practiced at Sharp. She did, and Dr. Klein "instructed [her] to go back to Dr. Amsberry" to discuss the symptoms of her head pain. Jacobs then saw a "new Sharp [p]rimary care physician," Dr. Ahmed Turek. An X-ray was taken and she was told she had "spondylosis which is an arthritic condition not related to the surgery."

---

[4]    The SAC incorrectly states his name is Dr. Tom Oliver-Klein. In a written stipulation filed on May 20, 2022, the parties agree the correct name is Dr. Tom-Oliver Klein.

On or after March 30, 2018, Jacobs "sought care outside of Dr. Amsberry's office and Sharp because she felt her complaints were not being addressed." She had experienced an increase in her symptoms, which included: insomnia, anxiety, and depression; pressure down the arm and in the chest and shoulders; and tingling, popping and ringing in her left ear. Jacobs contacted Dr. Matthew Leach, another ENT specialist, for a second opinion. Dr. Leach told her surgery was not needed or recommended, and she began non-invasive treatment for her ongoing symptoms. He had Jacobs undergo computed tomography (CT) and magnetic resonance imaging (MRI), "all of which showed various findings which are still being explored." Jacobs did not see the results of the imaging "until after 3/2019."

Jacobs obtained a "Best Doctors Report"[5] that was "dated on or about March 2019." She alleged "her suspicions were confirmed after" she received this report, and somewhat inconsistently, "[t]his is when [she] began to suspect that there may have been injuries and/or other complications that caused injuries to [her], arising from the surgery of 2/28/2017." She alleged the Best Doctors Report was based on information provided by Sharp but Sharp "did not provide the surgical record at the timing of the first Best Doctors [R]eport." And "[t]his is what prompted [her] suspicions." She then obtained Sharp's medical records in "approx[imately] 3/2019," which showed a "[f]rontal balloon dilation and endoscopic sphenoid balloon dilation" was performed. She was not aware these procedures were being performed during surgery. The medical records also showed "the presence or introduction of infection" during the surgery.

---

5    The SAC does not explain what a Best Doctors Report is, nor does the record on appeal.

On May 7, 2019, Jacobs emailed Dr. Amsberry and "several other physicians at Sharp" to complain of her continuing symptoms. When Dr. Amsberry responded, Jacobs asked him "if there were any complications in her procedure." He did not respond to that question, and instead asked to speak with her. In a phone call, Dr. Amsberry "pleaded" with Jacobs to see another doctor, Dr. Mair,[6] and "conveyed a sense of urgency that an additional surgery needed to be performed." Dr. Amsberry told Jacobs "Dr. Mair was an expert who had some ideas for a minimally invasive surgical procedure." But a few days later, Dr. Amsberry changed his mind, informing her that surgery was not the only option. Jacobs then agreed to see Dr. Mair, who performed an endoscopic examination and told her she might have "Empty Sella Syndrome which involves the pituitary gland."[7]

On June 17, 2019, Jacobs was tested for nerve damage by Dr. Butrous, a neurologist referred by Dr. Leach. Dr. Butrous told Jacobs she had "nerve damage on the left side in [the] occipital, neck, shoulder and left arm region," and referred her to Dr. Khoo, a neurosurgeon, who recommended surgery to correct the nerve damage. In all, Jacobs sought care from "several ENT doctors and specialist[s] , [n]eurologist, [n]eurosurgeon, [e]ar [s]pecialist, and [c]hiropractor specialist," as well as urgent care clinics.

On December 20, 2019, Jacobs underwent revision sinus surgery, which included a "ethmoidectomy, sphenoidectomy, bilateral revisions to all sinuses," and another septoplasty to correct her septal deviation and other

---

[6]  The SAC does not state Dr. Mair's complete name, nor that of Dr. Butrous and Dr. Khoo, whom we will discuss shortly.

[7]  The SAC does not state when Jacobs saw Dr. Mair, and May 7, 2019 is the last date that appears in the SAC that Jacobs received medical care or advice from Dr. Amsberry.

ongoing symptoms Jacobs had been experiencing. During the revision surgery, two "identically sized lesions" were removed from Jacobs's left sinus. Jacobs is "not sure" what these two lesions were but believes they were the stents placed in her nasal cavity during the first surgery "that were scheduled to be removed by Dr. Amsberry" but were not.

## II.

### Demurrer Proceedings

A. *Jacobs's SAC*

Eleven days after the revision surgery, on December 31, 2019, Jacobs filed this action against Sharp and Dr. Amsberry,[8] asserting four causes of action for professional negligence, lack of informed consent, intentional and deliberate fraud, and "medical incompetence." In March 2020, Jacobs filed a first amended complaint (FAC). Sharp and Dr. Amsberry demurred to the FAC, which the trial court sustained with leave to amend.

Jacobs filed the operative SAC in November 2020. She alleged Dr. Amsberry was "an individual employee and/or contracted agent" of Sharp. She asserted the same four causes of action against Dr. Amsberry, and against Sharp "under the doctrine of 'respondeat superior.'"

Jacobs alleged: "Of findings to date, [Jacobs] believes that she has suffered complications from surgery inter-operative and/or post-operative, and was not informed, nor were adequate procedures followed before, during and after the [February 28, 2017] surgery." Dr. Amsberry and Sharp's

---

[8] Jacobs also named Dr. Klein and Dr. Turek as defendants. Initially respondents in this appeal, this court dismissed the appeal as to Dr. Klein and Dr. Turek upon the parties' written stipulation. We do not discuss Dr. Klein and Dr. Turek further unless relevant to our discussion of the factual allegations within the SAC.

8

professional negligence in the surgery and substandard follow-up care resulted in her "continued[ ] infections, pain and suffering, corrective surgery and other quality of life altering issues." Dr. Amsberry and Sharp failed to apprise her of "many of the risks associated with surgery and procedures being performed." And they failed to inform her and obtain her consent to "performing additional . . . procedures," including "[f]rontal [b]alloon dilation" or "endoscopic sphenoid balloon dilation" which were described in Sharp's medical records. Jacobs "believes she was part of some clinical trials without her consent." She sought actual, economic, and punitive damages.

B.      *Sharp and Dr. Amsberry's Demurrer*

Sharp and Dr. Amsberry demurred to the SAC.[9]

First, they asserted Jacobs's professional negligence claim was time-barred under the one-year limitations period of section 340.5. They argued Jacobs's "injury" occurred in February 2017 when she underwent surgery "and, potentially, in March/April 2017" when she experienced symptoms, including " 'palpitations, rapid heartbeat, and pressure in her chest and arm'; 'burning in both eyes'; 'nasal dryness and pain/pressure on the inside of head'; '. . . nasal dryness and thick yellow mucus production; liquid coming from nose,' " and so on. They argued section 340.5's second element of when Jacobs suspected, or when a reasonable person would have suspected wrongdoing, was "an objective rather than a subjective standard."[10] And

---

[9]      Sharp and Dr. Amsberry also filed a motion to strike the punitive damages claim in the SAC, which Jacobs did not oppose and the trial court granted. The motion to strike is not at issue in this appeal, so we do not discuss it.

[10]      As we later explain, this is not an entirely correct statement of the law. (See Discussion Section II.C., *post*.) The one-year limitations period under

9

"[g]iven [Jacobs's] complaints and consultation with an outside doctor in March 2018, a reasonable person would have suspected at that time that someone did something wrong," and she "fail[ed] to allege facts to explain why she could not reasonably, th[r]ough due diligence, discover her injury by March 30, 2018, when she sought a second opinion."

Second, Sharp and Dr. Amsberry asserted the entire SAC failed for "uncertainty" as to all defendants, because it failed to allege sufficient "specific negligent conduct" taken by any defendant, other than Dr. Amsberry. They further asserted there were no factual allegations in the SAC to establish that Sharp was liable for any actions by Dr. Amsberry, and Dr. Amsberry, as a physician, is "legally precluded" from being an employee of Sharp's.

C. *Jacobs's Opposition*

In opposition, Jacobs (still a self-represented litigant) argued she acted reasonably in trying to discover the cause of her injury, and while doing so, the limitations period on her professional negligence claim was tolled. Jacobs did not address the issue of how Sharp could be liable for Dr. Amsberry's actions; instead, she asserted Dr. Amsberry performed certain procedures on her without her consent and without informing her of the associated risks.

D. *Trial Court's Ruling*

The trial court ruled the first cause of action for professional negligence against Sharp and Dr. Amsberry was barred by the one-year statute of limitations period under section 340.5, finding the SAC alleged "facts that

___

section 340.5 is determined under both a subjective and objective test; the first to occur under these two alternate tests triggers the limitations period. (*Kitzig v. Nordquist* (2000) 81 Cal.App.4th 1384, 1391 (*Kitzig*); accord *Kernan v. Regents of University of California* (2022) 83 Cal.App.5th 675, 680–681 (*Kernan*).)

10

demonstrate [Jacobs] suspected an injury and wrongdoing by March 30, 2018." It further determined the professional negligence claim and the second cause of action for lack of informed consent were "uncertain" as against Sharp, but not Dr. Amsberry; the third cause of action for fraud was uncertain against all defendants; and the fourth cause of action for " 'medical incompetence for procedures performed' " was duplicative of the professional negligence claim and likewise time-barred.[11]

The trial court sustained the demurrer as to all causes of action within the SAC, but overruled the demurrer as to the lack of informed consent claim against Dr. Amsberry. It denied Jacobs leave to amend, finding she failed to demonstrate how she could properly amend. On June 2, 2021, the court entered a judgment of dismissal against Sharp and Jacobs timely appealed.[12]

DISCUSSION

I.

*Standard of Review*

"The rules by which the sufficiency of a complaint is tested against a general demurrer are well settled." (*Centinela Freeman Emergency Medical Associates v. Health Net of California, Inc.* (2016) 1 Cal.5th 994, 1010.) "In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a

---

[11] As we have noted, Jacobs does not challenge the trial court's ruling sustaining the demurrer as to the third and fourth causes of action, and so we do not discuss them further.

[12] Dr. Amsberry is not a party to this appeal because there is no final judgment as to him. (See *Heshejin v. Rostami* (2020) 54 Cal.App.5th 984, 991 [in a multi-party case, a judgment is final and appealable when it leaves no issues to be determined as to one party].)

cause of action under any legal theory." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.) "We do not, however, assume the truth of contentions, deductions, or conclusions of fact or law." (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125.) "We 'accept as true not only those facts alleged in the complaint but also facts that may be implied or inferred from those expressly alleged.' " (*Munoz v. Patel* (2022) 81 Cal.App.5th 761, 771.) " ' "Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." ' " (*Centinela*, at p. 1010.)

Relevant here, "for a demurrer based on the statute of limitations to be sustained, the untimeliness of the lawsuit must clearly and affirmatively appear on the face of the complaint and matters judicially noticed." (*Coalition for Clean Air v. City of Visalia* (2012) 209 Cal.App.4th 408, 420 (*Clean Air*).) "This will not be the case unless the complaint alleges every fact which the defendant would be required to prove if he were to plead the bar of the applicable statute of limitation as an affirmative defense." (*Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 881.) "It is not sufficient that the complaint *might* be barred." (*Roman v. County of Los Angeles* (2000) 85 Cal.App.4th 316, 324–325.) "If the dates establishing the running of the statute of limitations do not clearly [and affirmatively] appear in the complaint . . . [t]he proper remedy 'is to ascertain the factual basis of the contention through discovery and, if necessary, file a motion for summary judgment[.]' " (*Ibid*.)

"And when [a demurrer] is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment:  if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." (*Blank*

*v. Kirwan* (1985) 39 Cal.3d 311, 318.) "The burden of proving such reasonable possibility is squarely on the plaintiff." (*Ibid*.)

## II.

*The Trial Court Erred in Sustaining the Demurrer as to Jacobs's Professional Negligence Claim as Time-Barred*

A.    *Section 340.5*

The parties agree Jacobs's first cause of action for professional negligence is governed by the statute of limitations prescribed by section 340.5.[13] "Section 340.5 provides that the time for commencement of an action for injury or death based on alleged professional negligence by a health care provider 'shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever [time period expires] first.' " (*Gutierrez v. Mofid* (1985) 39 Cal.3d 892, 896 (*Gutierrez*).) Thus the statute sets forth two periods of limitation—a three-year outside period and a one-year discovery period, "both of which must be met." (*Rose v. Fife* (1989) 207 Cal.App.3d 760, 767–768 (*Rose*); *Drexler v. Petersen* (2016) 4 Cal.App.5th 1181, 1189 ["A plaintiff in a medical malpractice action must satisfy the requirements of both the one-year and the three-year limitations periods."].)

---

[13]    Section 340.5 states: "In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first. In no event shall the time for commencement of legal action exceed three years unless tolled for any of the following: (1) upon proof of fraud, (2) intentional concealment, or (3) the presence of a foreign body, which has no therapeutic or diagnostic purpose or effect, in the person of the injured person."

"The three-year period begins to run when the plaintiff discovers the harmful effect, i.e., the physical manifestation of the wrongful act.  The negligent cause of that effect is not a concern for the three-year period." (*Rose*, *supra*, 207 Cal.App.3d at p. 768.)  "The one-year period commences when the plaintiff is aware of both the physical manifestation of the injury and *its negligent cause*."  (*Ibid.*; see *Gutierrez*, *supra*, 39 Cal.3d at p. 896 ["[T]he term 'injury,' as used in section 340.5, means both 'a person's physical condition *and* its "negligent cause." ' "].)

"The three-year period is tolled '(1) upon proof of fraud, (2) intentional concealment, or (3) the presence of a foreign body, which has no therapeutic or diagnostic purpose or effect, in the person of the injured person.'  The statute makes clear, however, that the one-year period is not similarly extended.  Thus, regardless of extenuating circumstances, the patient must bring his [or her] suit within one year after he discovers, or should have discovered, his 'injury.' "  (*Gutierrez*, *supra*, 39 Cal.3d at p. 896.)  In other words, "once a patient knows, or by reasonable diligence should have known, that he has been harmed through professional negligence, he has one year to bring his suit."  (*Ibid.*)

B.    *The Three-Year Outside Limitations Period Was Met*

There is no dispute Jacobs met the three-year outside period under section 340.5.  Jacobs filed her complaint on December 31, 2019.  Whether taking the latest date of the revision surgery on December 20, 2019, the date of March 30, 2018 when Jacobs sought a second opinion, or even the earliest date of the first surgery on February 28, 2017, the complaint was timely filed within the three-year limitations period.

For that reason, we are *not* presented with the question of whether the presence of a "foreign body" tolls the applicable limitations period, as both

14

parties suggested in their briefing. Jacobs contends her professional negligence claim was entitled to tolling because she sufficiently alleged that she first discovered on December 20, 2019 that a foreign body (i.e., the nasal stents) was left behind in the surgery. Sharp responds that although the foreign body exception "delays the start of the medical malpractice statute of limitations," Jacobs's SAC "establishes she was aware of the existence of the nasal stents as early as March 8, 2017," when Dr. Amsberry mentioned to her in the post-surgery visit on that date that "the stents" would be removed from her nasal cavity at the next visit. Both arguments miss the mark.

As we have explained, section 340.5's " 'foreign body' exception *only* tolls the three-year outside limitation period and not the one-year 'discovery' period." (*Ashworth v. Memorial Hospital* (1988) 206 Cal.App.3d 1046, 1058, italics added; see *Gutierrez, supra*, 39 Cal.3d at p. 896 ["The statute makes clear, however, that the one-year period is not similarly extended" by the presence of a foreign body.].) Because the three-year limitations period was met here, the foreign body exception is a red herring. We next turn to whether Jacobs's SAC was barred by the one-year discovery limitations period.

C.    *The SAC Does Not Clearly and Affirmatively Establish, as a Matter of Law, That the Professional Negligence Claim Is Time-Barred by the One-Year Discovery Period*

Under the one-year discovery rule, a plaintiff must bring her suit within "one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury." (§ 340.5.) "[T]he term 'injury,' as used in section 340.5, means both 'a person's physical condition *and* its "negligent cause." ' " (*Gutierrez, supra*, 39 Cal.3d at p. 896, quoting *Sanchez v. South Hoover Hospital* (1976) 18 Cal.3d 93, 99 (*Sanchez*).) Thus, " 'the [one-year] statute of limitations begins to run when the plaintiff suspects or

15

should suspect that her injury was caused by wrongdoing.' " (*Kitzig*, *supra*, 81 Cal.App.4th at p. 1391, quoting *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110 (*Jolly*).) "This [discovery] rule sets forth two alternate tests for triggering the [one-year] limitations period: (1) a subjective test requiring actual suspicion by the plaintiff that the injury was caused by wrongdoing; and (2) an objective test requiring a showing that a reasonable person would have suspected the injury was caused by wrongdoing." (*Kitzig*, at p. 1391; accord *Kernan*, *supra*, 83 Cal.App.5th at p. 681.) "The first to occur under these two tests begins the limitations period." (*Kitzig*, at p. 1391; *Kernan*, at p. 681.)

The trial court determined the one-year discovery period began to accrue on March 30, 2018, making Jacobs's professional negligence claim too late when the action was filed 21 months later on December 31, 2019. The court found the SAC alleged Jacobs had "suffered 'ongoing symptoms' " and expressed "suspicions to Dr. Amsberry" in June 2017 that "**the antibiotics were not clearing the infection, the antibiotics may not have been properly prescribed**, or perhaps some other pathology was responsible for the continuous infections." And that "[s]he ha[d] on several occasions asked about tests that could be performed to find out what type of infection it was or where it was, including asking about CSF Leak, Empty Nose Syndrome or any other **complications from surgery**." The court ruled the SAC demonstrated "[Jacobs] had sufficient reason to seek a second opinion by March 30, 2018, because she had ongoing symptoms and she suspected wrongdoing (at a minimum, improper prescription)." And although Jacobs "may not have discovered all of the details of the causes of the injury," the court found the SAC sufficiently alleged "facts that demonstrate[d] she suspected an injury and wrongdoing by March 30, 2018."

16

On our de novo review, we conclude the trial court erred. As we shall explain, the SAC does not "clearly and affirmatively" (*Clean Air*, *supra*, 209 Cal.App.4th at p. 420) establish, as a matter of law, that the one-year discovery period was triggered on March 30, 2018, under either the subjective or objective tests. Because the trial court's analysis focused on whether Jacobs actually suspected her ongoing symptoms were caused by Dr. Amsberry's wrongdoing when she sought a second opinion on March 30, 2018, we begin with the subjective prong of the discovery rule. (See *Kitzig*, *supra*, 81 Cal.App.4th at p. 1391.)

1. *The Subjective Test*

Applying the subjective test and liberally construing the complaint in her favor, we conclude Jacobs sufficiently pled circumstances—overlooked by the trial court—that preclude a finding that her professional negligence claim is manifestly barred by the one-year discovery period. Specifically, we conclude Jacobs sufficiently pled delayed discovery of facts based on her reasonable reliance on Dr. Amsberry's repeated assurances that her ongoing symptoms were unrelated to the surgery, such that the act of obtaining a second opinion on March 30, 2018 did not necessarily trigger the one-year discovery limitations period.

First, as this court observed in *Kitzig*, *supra*, 81 Cal.App.4th at page 1393, "it is not the law that a person who obtains a second medical opinion while under the care of her personal physician and the second physician confirms that her physician is 'doing nothing wrong' and then she continues her treatment with her physician, is under an obligation—as a matter of law—to bring suit within one year." And "[a]lthough the subjective prong of the discovery rule requires merely a suspicion ' "that someone has done something wrong" to him' [citation], a patient 'is fully entitled to rely upon

17

the physician's professional skill and judgment while under his care, and has little choice but to do so.' " (*Ibid.*, quoting *Sanchez, supra*, 18 Cal.3d at p. 102.) "While this reliance may not be justified if the patient actually suspects wrongdoing [citation], *this suspicion must be meaningful by having some effect on the patient's ongoing relationship with her doctor.*" (*Kitzig*, at p. 1393, italics added.)

*Kitzig* is instructive here. Kitzig sued her dentist for professional negligence, alleging he improperly placed dental implants. (*Kitzig, supra*, 81 Cal.App.4th at pp. 1386–1389.) Under the dentist's care from 1992 to 1995, which included eight surgeries, Kitzig experienced breathing problems, dizziness, and headaches; multiple implant infections; implants pushing up into her sinus and an opening between her mouth and sinus; and pain. (*Ibid.*) The dentist, however, assured Kitzig some of her symptoms " 'didn't have anything to do with the implants' "; "the implants looked good and were healing"; the hole in her sinus was not really concerning and "it would probably close on its own." (*Ibid.*) So Kitzig continued to see the dentist regularly, even when she " 'didn't feel really good about it,' " because she believed him that everything was fine. (*Id.* at p. 1389.) In March 1995, more than three years after the first surgery, Kitzig's husband felt " 'something wasn't right' " because his wife was losing too many implants and suffering too many infections; Kitzig then went to her husband's dentist who found the implants were failing. (*Ibid.*) In January 1996, after undergoing extensive surgeries with another doctor to repair the damage, Kitzig served the dentist with her notice of intention to sue. (*Id.* at p. 1390.)

On appeal, the dentist asserted there was insufficient evidence to support the jury's finding that Kitzig timely filed her professional negligence claim. He argued the one-year discovery period had run, since Kitzig

18

admitted she went to see a different physician in May 1994, more than a year before she filed the lawsuit, because "she was 'suspicious' [he] may have done something wrong because she 'had that hole in [her] sinus.' " (*Kitzig*, *supra*, 81 Cal.App.4th at p. 1392.) We disagreed that the plaintiff's suspicion was sufficient to trigger the one-year limitations period under section 340.5. (*Id.* at pp. 1392–1396.)

We held in *Kitzig* the mere act of seeking a second medical opinion "whenever a patient is motivated by a possible suspicion . . . that her doctor was 'doing something wrong' " does not, as a matter of law, *necessarily* trigger the one-year statute of limitations. (*Kitzig*, *supra*, 81 Cal.App.4th at pp. 1393–1394.) Such a rule "would hinder a patient's ability to obtain the best medical care." (*Id.* at p. 1393.) We noted the plaintiff's "briefly held 'suspicion' regarding the hole in her sinus had no [meaningful] effect on her continuing relationship with [the dentist] and that she continued to rely exclusively on [his] medical judgment." (*Ibid*.) We therefore concluded "[a] finding that Kitzig was required to bring suit under these circumstances is inconsistent with the accepted practice of obtaining a second opinion during ongoing medical treatment." (*Ibid*.) Those circumstances included the fact the dentist "remained involved and continued to treat Kitzig and assure her there were no problems," advice we held she "certainly had a reasonable basis to rely on." (*Id.* at p. 1394.)

This case is strikingly similar to *Kitzig*, only Jacobs's claim was dismissed at the pleading stage where we are concerned " 'only [with] the legal sufficiency of the complaint, not the truth of its factual allegations or the plaintiff's ability to prove those allegations' " (*Stueve Bros. Farms, LLC v. Berger Kahn* (2013) 222 Cal.App.4th 303, 310), and where we assume the

19

truth of the facts alleged and liberally construe them in Jacobs's favor (see *Higgins v. Del Faro* (1981) 123 Cal.App.3d 558, 565 (*Higgins*)).

Jacobs alleged in the SAC she continued under Dr. Amsberry's care for nearly 27 months after the sinus surgery, from February 28, 2017 to at least May 7, 2019, despite any concerns or questions she had regarding her ongoing symptoms after the surgery, and even after she sought a second opinion from Dr. Leach on March 30, 2018. Importantly, like *Kitzig*, she alleged that during the period she remained under Dr. Amsberry's care, he repeatedly assuaged her concerns that her pain and symptoms were unrelated to the surgery.

Jacobs alleged Dr. Amsberry assured her when she awoke from the surgery "there were no complications" during the procedure, an assurance he did not disavow on May 7, 2019 when she again asked him "if there were any complications in her procedure." Jacobs did complain in her post-surgery visits of various symptoms, and had expressed concerns or asked whether the symptoms "*could be* the result of the [surgery]," whether "the antibiotics *may* not have been properly prescribed," whether she *could be* suffering a CSF leak, empty nose syndrome, "or any other complications from surgery." (Italics added.) But Dr. Amsberry, whom she "trusted," told Jacobs the symptoms were "normal" and that "everything was looking good." He told her he did not see any signs of a CSF leak, did not think she had empty nose syndrome, and "the pain was *not* related to her sinuses." (Italics added.)

Dr. Amsberry also told Jacobs to follow up with her primary doctor, and when she saw Dr. Turek, he told her she had "spondylosis which is an arthritic condition *not* related to the surgery." (Italics added.) He also referred her to Dr. Mair, who told her sometime after May 7, 2019, that she might have "Empty Sella Syndrome which involves the pituitary gland."

20

Under these circumstances, as alleged in the SAC, it was error for the trial court to dismiss Jacobs's professional negligence claim on demurrer as time-barred. As our high court has observed, "[i]n many cases, the harm caused by medical malpractice is not immediately apparent. The best medical treatment sometimes fails, or requires long and difficult recuperation, or produces bad side effects. Thus, even if a patient is unhappy with h[er] condition, [s]he may not suspect [s]he has been wronged. Lacking medical knowledge, [s]he may reasonably rely upon [her] negligent physician's soothing disclaimers." (*Gutierrez, supra*, 39 Cal.3d at p. 899.) Here, the trial court gave no consideration to Jacobs's allegations that, even as she expressed concerns or raised questions about her ongoing symptoms, she reasonably relied on Dr. Amsberry's professional opinion that her symptoms were "normal" and continued in his care. (See *Kernan, supra*, 83 Cal.App.5th at p. 683 [holding where plaintiff remained under her doctors' care and continued to work with the hospital after learning of her fetus's death, that "a reasonable trier of fact could infer from these actions that plaintiff continued to trust the hospital even after learning of the [intrauterine fetal demise], undermining defendant's contention that plaintiff subjectively suspected defendant's negligent performance of the [external cephalic version] procedure on the day she learned her baby had died"].)

The trial court also placed heavy reliance on the fact that Jacobs sought a second opinion from Dr. Leach on March 30, 2018 to determine that she suspected wrongdoing by that date. We first note the court's interpretation of the SAC that Jacobs "had sufficient reason to seek a second opinion . . . because she had ongoing symptoms and she suspected wrongdoing (at a minimum, improper prescription)" is not a fair read of the allegations. Jacobs alleged she "sought care outside of Dr. Amsberry's office and Sharp because

21

*she felt her complaints were not being addressed*" (italics added), not because she suspected her symptoms were caused by Dr. Amsberry's or Sharp's wrongdoing. (See *Higgins, supra,* 123 Cal.App.3d at p. 565 [The facts alleged in the complaint are "assumed to be true and liberally construed in favor of the party against whom the motion is made."].) Indeed, Jacobs explicitly stated in the SAC that her solicitation of a second opinion "does not mean she knew she suffered an injury but rather when one is not satisfied with care, one seeks other care."

Notably, as Jacobs alleged, Dr. Leach's second opinion did not provide her with any information, on March 30, 2018, regarding the cause of her ongoing symptoms or that Dr. Amsberry had done anything wrong. (See *Sanchez*, *supra*, 18 Cal.3d at p. 102 [concluding plaintiff's "reasonably founded suspicions were [shown to be] undeniably aroused . . . both by her own recognition of her symptoms and *by external corroboration*" (italics added)].) Jacobs alleged Dr. Leach told her surgery was not needed or recommended and he took CT and MRI imaging—the results of which she did not see "until after 3/2019" and "which showed various findings which are *still being explored.*" (Italics added.)

It is therefore not correct, as Sharp suggests in its briefing on appeal, that Jacobs alleged the imaging studies Dr. Leach ordered "led [Jacobs] to believe . . . that she had 'suffered complications from surgery' " on March 30, 2018.[14] Rather, Jacobs explicitly alleged "[she] began to suspect that there

---

[14] Sharp contends Jacobs admitted in her SAC that she actually suspected, on March 30, 2018, she had " 'suffered complications from surgery,' " and the trial court appears to have adopted this viewpoint in the order sustaining Sharp's demurrer. A close reading of the entire allegation, in its context, does not support that interpretation. After alleging the events of March 30, 2018, in the past tense, Jacobs shifted to the present tense and

may have been injuries and/or other complications that caused injuries to [her], arising from the surgery of 2/28/2017" *in March 2019*, when she obtained the Best Doctors Report.

And it is sometime *after March 2019* that Jacobs's suspicion was "meaningful," in that it had "some effect on [her] ongoing relationship" with Dr. Amsberry. (*Kitzig*, *supra*, 81 Cal.App.4th at p. 1393.) The SAC alleged she sought medical advice or care from Dr. Amsberry again in May 2019 and as a result, saw Dr. Mair on his referral. The SAC does not state Jacobs was treated by Dr. Amsberry again after that date. In June 2019, Jacobs saw Dr. Butrous, a neurologist, who told her she had nerve damage and referred her to Dr. Khoo, a neurosurgeon, who recommended surgery to correct the nerve damage. She then filed her notice of intention to sue the defendants in November 2019 and underwent revision sinus surgery, presumably with a different doctor and thereby discontinued treatment with Dr. Amsberry, in December 2019. Thus, liberally construing the SAC in her favor, the earliest date on which it could be determined, as matter of law, that Jacobs actually suspected her ongoing symptoms were caused by the surgery was March 2019, making her action timely filed on December 31, 2019.

### 2. *The Objective Test*

Under the objective test, "[t]he patient is charged with 'presumptive' knowledge of his negligent injury, and the statute commences to run, once he

_____

alleged: "Of findings *to date*, Plaintiff *believes* that she has suffered complications from surgery inter-operative and/or post-operative, and was not informed, nor were adequate procedures followed before, during and after the surgery of 2/28/2017." (Italics added.) Giving the SAC a reasonable interpretation and reading it as a whole and its parts in context, as we must, the phrase "to date" and the shift from past to present tense demonstrate that Jacobs was describing her belief at the time the SAC was filed—*not* as it was on March 30, 2018.

23

has ' "notice or information of circumstances to put a reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to his investigation." ' " (*Gutierrez, supra,* 39 Cal.3d at pp. 896–897, quoting *Sanchez, supra,* 18 Cal.3d at p. 101, italics omitted.) "Thus, when the patient's '*reasonably founded suspicions* [have been aroused],' and she has actually 'become alerted to the necessity for investigation and pursuit of her remedies,' the one-year period for suit begins." (*Gutierrez,* at p. 897, quoting *Sanchez,* at p. 102, italics added.)

Because we have concluded that, on the face of the SAC, the earliest date by which Jacobs had actual suspicion that her injury was caused by Dr. Amsberry's wrongdoing is March 2019, an analysis under the objective prong of the discovery rule necessarily focuses on whether it is affirmatively clear from the SAC that a reasonable person in Jacobs's position should have suspected the injury was caused by the wrongdoing *sooner*. (See *Kitzig, supra,* 81 Cal.App.4th at p. 1391.) We conclude it is not.

Again, Jacobs remained under Dr. Amsberry's care for nearly 27 months after her surgery. And during that time, Jacobs's concerns and questions about her ongoing symptoms after the surgery were allayed by Dr. Amsberry's repeated assurances that she had not suffered any complications from the surgery, as well as by Dr. Turek's opinion, after an X-ray, that "she had spondylosis which is an arthritic condition not related to the surgery," and by Dr. Mair's opinion, after an endoscopic examination sometime after May 7, 2019, that she might have "Empty Sella Syndrome which involves the pituitary gland."

As courts have recognized, an ordinary lay person does not have the education, information or experience to reach a reasonable conclusion on their own, without professional advice, as to what is causing their ailments.

24

(See *Gutierrez, supra,* 39 Cal.3d at p. 899 ["The best medical treatment sometimes fails, or requires long and difficult recuperation, or produces bad side effects."]; *Kitzig, supra,* 81 Cal.App.4th at p. 1392 [" 'The mere fact that an operation does not produce hoped-for results does not signify negligence and will not cause commencement of the statutory period.' "].) Although Jacobs may have been aware something was physically wrong with her after the surgery, her symptoms required medical expertise to determine their cause. But here, she received the medical opinions of at least three doctors that her physical ailments were unrelated to the surgery or her sinuses. Under an objective standard, based on the allegations of the SAC, Jacobs had no " ' "notice or information of circumstances [that would] put a reasonable person on inquiry [notice]" ' " of Dr. Amsberry's alleged wrongdoing sooner than March 2019, when she alleged the Best Doctors Report provided her with information of his professional negligence. (*Gutierrez,* at p. 896, italics omitted.)

We are not persuaded by Sharp's argument that "the imaging studies [ordered by Dr. Leach on March 30, 2018] led [Jacobs] to believe, as she stated in her [SAC], that she had 'suffered complications from surgery,' " and mere "[s]uspicion of wrongdoing is sufficient to constitute discovery." As we have already explained, this is a mischaracterization of the SAC. Jacobs does not allege the imaging studies led her to believe she had suffered complications from the surgery, on March 30, 2018. (See footnote 14, *ante.*) Moreover, the cases on which Sharp relies for the proposition that the one-year discovery period is triggered the moment a plaintiff has any suspicion are inapposite. Whether applying a subjective or objective test, none of those

cases involve a situation where, as here, a plaintiff's suspicions are allayed by the medical opinions of doctors, including her treating doctor.[15]

Quoting *Jolly, supra*, 44 Cal.3d at pages 1110 to 1111, in particular, Sharp argues "[a] plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pre-trial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." This quotation is taken out of context. Immediately before the quoted language, our high court said: "Under the

---

[15] See e.g., *Knowles v. Superior Court* (2004) 118 Cal.App.4th 1290, 1293–1294, 1298–1301 (applying the one-year discovery rule to determine when family members of a decedent should have reasonably discovered that a doctor's professional negligence in performing a surgery caused decedent's death); *Rivas v. Safety-Kleen Corp.* (2002) 98 Cal.App.4th 218, 222, 224–225, 230–231 (applying a different statute of limitations (section 340, subdivision (3)) in a personal injury case against manufacturers and suppliers of certain toxic chemicals); *Dolan v. Borelli* (1993) 13 Cal.App.4th 816, 820–821, 824–825 (applying the one-year discovery rule to determine when a plaintiff should have known, through reasonable diligence, that a doctor negligently failed to "release her right carpal tunnel ligament during the first operation"); *Barber v. Superior Court* (1991) 234 Cal.App.3d 1076, 1079, 1082–1083 (applying the one-year discovery rule to determine when a plaintiff should have known that a doctor was negligent in diagnosing and treating plaintiff's appendicitis); *Rose, supra*, 207 Cal.App.3d at pp. 763, 766, 769, 771–772 (concluding the one-year discovery period began to accrue when plaintiff was hospitalized and told by two doctors that her infection was caused by an intrauterine device (IUD), even though plaintiff was not aware of the specific brand of IUD that was responsible for her injuries); *Steingart v. White* (1988) 198 Cal.App.3d 406, 416 (in applying the one-year limitations period, the court held that "there remains at minimum a triable issue of fact as to whether [the plaintiff] exercised reasonable diligence after the purported misdiagnosis" of her cancer).

discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was *caused by wrongdoing*, that someone has done something wrong to her." (*Jolly,* at p. 1110, italics added.)

The plaintiff in *Jolly* admitted in her deposition she was interested in obtaining more information about the drug at issue "because she wanted to 'make a claim,' " and "she felt someone had done something wrong to her concerning [the drug], that it was a defective drug and that she should be compensated," more than a year before she filed suit. (*Jolly, supra*, 44 Cal.3d at p. 1112.) Thus, in *Jolly*, our high court held the discovery period ran when the uncontradicted facts established the plaintiff suspected the defendants' conduct was wrongful "well over a year before she filed suit" and "*[t]his suspicion would not have been allayed by any investigation.*" (*Ibid.,* italics added.)

Unlike *Jolly*, and the other cases cited by Sharp, Jacobs alleged any suspicion she had about her symptoms after the surgery were allayed by Dr. Amsberry, and the other doctors, such that she continued in his care until at least May 2019. Under these circumstances, it cannot be said as a matter of law that Jacobs had notice or information of circumstances that would put a reasonable person on inquiry notice of Dr. Amsberry's alleged wrongdoing on March 30, 2018, as urged by Sharp.

III.

*The Trial Court Erred in Sustaining the Demurrer to Jacobs's Claims for Professional Negligence and Lack of Consent Against Sharp for Uncertainty*

The trial court sustained Sharp's demurrer to Jacobs's claims for professional negligence and lack of informed consent as "uncertain" against Sharp, but not Dr. Amsberry. The court explained it "fail[ed] to see how [Sharp is] liable for medical negligence," finding the "SAC does not support

27

that [Sharp was] evasive and or dismissive in a manner that breached a duty or caused any injury." The court determined the lack of informed consent claim was based on the allegation "additional procedures were performed for which no consent was obtained." It found that "[w]hile [Jacobs] does not specify what the procedures were, Dr. Amsberry is in a position to know which procedures are referenced for which consent was not obtained" and thus the claim was not uncertain as to him. But as to Sharp, the court concluded Jacobs failed to allege how Sharp was involved with the alleged additional procedures.

As to the lack of consent claim, Jacobs contends she sufficiently alleged Sharp was vicariously liable for the actions of Dr. Amsberry on a theory of ostensible agency. And although neither party expressly addresses the trial court's ruling on the professional negligence claim for uncertainty, Jacobs has implicitly but sufficiently raised the issue on appeal. On our de novo review, we conclude the trial court erred in finding both claims uncertain as to Sharp's liability. In reaching its decision, the trial court misapplied the demurrer standard for uncertainty and failed to consider Jacobs's allegation that Sharp could be vicariously liable for Dr. Amsberry's actions under an agency theory.

Section 430.10, subdivision (f), provides a party may demur to a pleading on the ground that "[t]he pleading is uncertain," and that " 'uncertain,' " as used in this subdivision, "includes ambiguous and unintelligible." " 'A demurrer for uncertainty is strictly construed, even where a complaint is in some respects uncertain, because ambiguities can be clarified under modern discovery procedures.' " (*Chen v. Berenjian* (2019) 33 Cal.App.5th 811, 822.) " ' "[D]emurrers for uncertainty are disfavored, and are granted only if the pleading is so incomprehensible that a defendant

28

cannot reasonably respond." ' " (*A.J. Fistes Corp. v. GDL Best Contractors, Inc.* (2019) 38 Cal.App.5th 677, 695 (*A.J. Fistes*).)

In California, a hospital may be held liable for a physician's wrongdoing when the physician is an ostensible agent of the hospital. (See, e.g., *Markow v. Rosner* (2016) 3 Cal.App.5th 1027, 1038 (*Markow*); *Mejia v. Community Hospital of San Bernardino* (2002) 99 Cal.App.4th 1448, 1453 (*Mejia*).) This rule of allowing hospitals to be held vicariously liable for the negligence of physicians "cast[s] aside" the historical impediment that "traditional rules of respondeat superior" did not apply to skilled professionals, such as physicians. (*Mejia*, at pp. 1451–1452.) As health care services modernized over time, courts "soon realized . . . the traditional emphasis on the master's ability to control the servant was unrealistic in the context of the modern health care system." (*Id.* at p. 1453.)

" 'The conception that the hospital does not undertake to treat the patient, does not undertake to act through its doctors and nurses, but undertakes instead simply to procure them to act upon their own responsibility, no longer reflects the fact. Present-day hospitals, as their manner of operation plainly demonstrates, do far more than furnish facilities for treatment. They regularly employ on a salary basis a large staff of physicians, nurses, and internes, as well as administrative and manual workers, and they charge patients for medical care and treatment, collecting for such services, if necessary, by legal action. Certainly, the person who avails himself of "hospital facilities" expects that the hospital will attempt to cure him, not that its nurses or other employees will act on their own responsibility.' " (*Mejia*, *supra*, 99 Cal.App.4th at p. 1453.) "In light of this modern reality, the overwhelming majority of jurisdictions employed

29

ostensible or apparent agency to impose liability on hospitals for the negligence of independent contractor physicians." (*Ibid.*)

Where a patient seeks to hold a hospital liable for the negligence of a physician, the doctrine of ostensible agency requires two elements: "(1) conduct by the hospital that would cause a reasonable person to believe that the physician was an agent of the hospital, and (2) reliance on that apparent agency relationship by the plaintiff." (*Mejia, supra*, 99 Cal.App.4th at p. 1453; accord *Markow, supra*, 3 Cal.App.5th at p. 1038.) "[O]stensible agency is based on appearances." (*Mejia*, at p. 1459.)

"Generally, the first element is satisfied 'when the hospital "holds itself out" to the public as a provider of care,' 'unless it gave the patient contrary notice.' " (*Markow, supra*, 3 Cal.App.5th at p. 1038.) To establish this element, "it is not necessary to show an express representation by the hospital." (*Mejia, supra*, 99 Cal.App.4th at p. 1454.) "Reliance upon an apparent agency[, the second element,] is demonstrated 'when the plaintiff "looks to" the hospital for services, rather than to an individual physician.' " (*Markow,* at p. 1038.) "Ultimately, 'there is really only one relevant factual issue: whether the patient had reason to know that the physician was not an agent of the hospital. As noted above, hospitals are generally deemed to have held themselves out as the provider of services unless they gave the patient contrary notice, and the patient is generally presumed to have looked to the hospital for care unless he or she was treated by his or her personal physician. Thus, unless the patient had some reason to know of the true relationship between the hospital and the physician—i.e., because the hospital gave the patient actual notice or because the patient was treated by his or her personal physician—ostensible agency is readily inferred.' " (*Ibid.*)

30

Here, Jacobs specifically alleged she asserted her "causes of action against [Sharp], under the doctrine of 'respondeat superior', through the actions of its employees and/or contracted agents including physicians, surgeons and other staff and support members, including but not limited to nurses, technicians, anesthesiologist and any other supporting employees." She alleged Dr. Amsberry is "an employee and/or contracted agent" of Sharp's and "at all times relevant to the injuries complained herein, was acting in the course and scope of his capacity as an employee and/or contracted agent" of Sharp's." These allegations, alone, are sufficient to survive a demurrer for uncertainty as to Sharp's vicarious liability for Dr. Amsberry's actions. "An allegation of agency is an allegation of ultimate fact that must be accepted as true for purposes of ruling on a demurrer." (*City of Industry v. City of Fillmore* (2011) 198 Cal.App.4th 191, 212, citing *Skopp v. Weaver* (1976) 16 Cal.3d 432, 437.)

Although a plaintiff is not required to allege evidentiary facts to support the allegation of agency in the pleading stage (*Dones v. Life Insurance Company of North America* (2020) 55 Cal.App.5th 665, 685), the SAC did allege supporting facts. Jacobs alleged that Dr. Amsberry referred her to other doctors who are similarly "employee[s] and/or contracted agent[s]" of Sharp's and who assisted Dr. Amsberry in providing care for Jacobs, including performing medical tests Dr. Amsberry ordered for Jacobs. She further alleged Sharp possessed Jacobs's medical records related to the care she received from Dr. Amsberry. Nothing in the SAC reveals that Sharp gave Jacobs "contrary notice" that it was not the provider of care, or that Dr. Amsberry was Jacobs's personal physician. (*Markow, supra*, 3 Cal.App.5th at p. 1038; see *id.* at p. 1032 [reversing judgment after jury verdict against hospital on ostensible agency theory where hospital "unambiguously

31

informed" plaintiff in 25 conditions of admission forms that "all physicians furnishing services to patients were independent contractors, not agents or employees of [the hospital]"].)

On our de novo review, we conclude the trial court failed to strictly construe the SAC against uncertainty when analyzing Sharp's demurrer, and ostensible agency is " 'readily inferred' " from the SAC at this pleading stage. (*Markow, supra,* 3 Cal.App.5th at p. 1038.) It cannot be said, as a matter of law, that the SAC " ' "is so incomprehensible that [Sharp] cannot reasonably respond" ' " to a theory of liability based on ostensible agency. (*A.J. Fistes, supra,* 38 Cal.App.5th at p. 695.) We therefore conclude the SAC is not uncertain as to Sharp's liability on a theory of ostensible agency.[16]

Sharp's arguments to the contrary are not persuasive. In response, Sharp devotes all but two sentences, asserting that although Jacobs "pleaded actual agency exclusively in her [SAC]," she now argues for ostensible agency "without seeking an amendment to properly amend her Verified [SAC] to state a cause of action in the trial court or in these proceedings." But as we have concluded, Jacobs sufficiently alleged that Dr. Amsberry is Sharp's

---

[16] Jacobs also contends that Dr. Amsberry was an employee of Sharp. (But see *Lathrop v. HealthCare Partners Medical Group* (2004) 114 Cal.App.4th 1412, 1420 ["Historically, in order to protect the public from possible commercial exploitation, physicians were barred from taking a salary from a for-profit corporation or other artificial legal entity."]). However, we need not reach this issue because " '[i]f the complaint states a cause of action under *any* theory, . . . that aspect of the complaint is good against a demurrer.' " (*Hoffman v. Smithwoods RV Park, LLC* (2009) 179 Cal.App.4th 390, 400, italics added.) Here, we conclude Jacobs's professional negligence and lack of consent claims survive the demurrer as to Sharp based on her theory of ostensible agency.

ostensible agent at the pleading stage.  She does not need to seek leave to amend on this issue.

Sharp next asserts "an agency finding is legally insufficient" because Jacobs's lack of consent claim is also time-barred under section 340.5.  We could very well dispose of this assertion on well-established appellate rules because Sharp does not develop the argument nor cite to any authority.  (See *City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287 ["we may disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt"]; *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184–185, fn. 1. [" '[a]n appellate court will ordinarily not consider procedural defects or erroneous rulings, in connection with relief sought or defenses asserted, where an objection could have been but was not presented to the [trial] court by some appropriate method' "].)  The argument, however, is without merit.  By its plain language, section 340.5 is applicable *only* to a "professional negligence" claim.  (§ 340.5.)  A lack of consent claim is a battery (*Thor v. Superior Court* (1993) 5 Cal.4th 725, 735) and it is therefore "governed by the two-year statute of limitations set forth in . . . section 335.1." (*Pugliese v. Superior Court* (2007) 146 Cal.App.4th 1444, 1450).

## DISPOSITION

The judgment in favor of Sharp is reversed with the following directions.  On remand, the trial court shall (1) vacate its order sustaining Sharp's demurrer and (2) enter a new order overruling Sharp's demurrer on the first and second causes of action and otherwise sustaining the demurrer

33

without leave to amend on the third and fourth causes of action.  Jacobs shall recover her costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


DO, J.

WE CONCUR:


IRION, Acting P. J.


DATO, J.